Whitaker, Judge,
dissenting:
I cannot agree with the decision of the majority.
Article SIX of the contract does not say that in the event of a condition beyond plaintiff’s control, the time for performance of the contract would be extended. The article merely says that such a condition will excuse performance. The contract completion date was September 30,1954. The Government is under no obligation to further extend the time or to pay for zinc mined after that date.
The Government made no representation to plaintiff with respect to the zinc content of the ore to be extracted from the mine. The Government made no borings to ascertain the zinc content. The borings were made by plaintiff. Certainly the Government is not in anyway obligated, either legally or equitably, to relieve plaintiff from the consequences of its reliance upon the indications obtained from its own exploration.
I would dismiss the plaintiff’s petition.
BINDINGS OF EACT
The court, having considered the evidence, the report of Commissioner Currell Vance, and the briefs and argument of counsel, makes findings of fact as follows:
*501 1. Plaintiff, Vinegar Hill Zine Company, is a corporation organized and existing under the laws of the State of Illinois. Its principal office and place of business was at Platte-ville, Wisconsin.
2. By letter dated June 30, 1951, the United States, acting through the Administrator of General Services, entered into an agreement with the plaintiff for the production of zinc. That agreement, evidenced by a letter of intent accepted by the plaintiff, recited that the United States would later enter into a formal contract with plaintiff to provide for the production and sale of 5,000 short tons of slab zinc. The agreement provided that the production and sale should' commence upon completion of construction of additional facilities for mining zinc at the plaintiff’s zinc, lead deposit known as the Mulcahy property in Lafayette County, Wisconsin. Such additional facilities were to be completed within one year after the execution of the order and the contract was to be in force for a period' of 3 years from the date of the order, subject to force majeure conditions, but in no event later than August 31,1955. The letter of intent specified the formula for the purchase of zinc by the Government, including prices to be paid therefor, and for the sale thereof to others.
3. Paragraph 4 of the letter of intent provided:
It is understood and agreed that your obligations and contract rights under this agreement may be modified by the occurrence of force majeure conditions. During the existence of any such force majeure conditions, you will not be required to make deliveries under the contract, but deliveries will be resumed as promptly as possible on the expiration of such conditions and, in the event of such force majeure conditions extending or suspending your production, the contract period will be extended accordingly. However, this contract in any event shall terminate on August 31, 1955. Any amounts remaining undelivered at that time, delivery of which was prevented by force majeure conditions, will be cancelled automatically without further obligation to either party.
4. Plaintiff’s acceptance of the order bound it to proceed without delay to purchase materials and make commitments to produce the additional zinc. Plaintiff also agreed to *502 enter into negotiations with the General Services Administration looking to the execution of a formal definitive contract containing the provisions of the letter of intent and such other terms and conditions as might be agreed upon by the parties.
The letter recited that it was authorized by the Defense Production Act of 1950, p. 774, 81st Congress; Strategic and Critical Materials Stock Piling Act, 60 Stat. 596; Federal Property and Administrative Services Act 1949, p. 152, 81st Congress, as amended.
5. On December 15,1952, the parties entered into a formal contract, effective June 30, 1951. That contract contained, among others, the following provisions:
ARTICLE I. MINING AND CONCENTRATION OE ORE
The Contractor shall proceed as expeditiously as possible, and at its own expense, with the development, equipping and preparation of its zinc lead deposit in Lafayette County, Wisconsin, known as the Mulcahy property. Such development, equipping and preparation will be known as the “additional facilities” and shall be sufficient to enable the Contractor to meet its obligations under this Contract; and the Contractor, at its own expense, will make such contracts and commitments for supplies and services as are necessary therefor.
The Contractor shall begin the mining of ore from the above deposit as soon as possible and commencing not later than one (1) year from the effective date of this contract, the Contractor’s production of concentrates from the aforesaid additional facilities shall be and continue at a rate, sufficient to enable it to have recovered therefrom 5,000 short tons (2,000 pounds avoirdupois each) of slab zinc within three (3) years from the effective date hereof.
ARTICLE m. DISPOSITION OE PRODUCTION
. The zinc concentrates produced pursuant to Article I hereof shall be disposed of as follows:
(a) The Government may require the Contractor upon sixty (60) days notice, to have slab zinc produced from any quantity not exceeding fifty percent (50%) of such concentrates, for such periods as the Govern■ment may specify; and to sell such slab zinc to the Government on the following bases:
*503 (i) up to twenty-five percent (25%) of the Contractor’s production may be purchased by the Government at the price set forth in Article V (a) and (c);
(ii) up to an additional twenty-five percent (25%) of the Contractor’s production may be purchased by the Government at the price set forth in Article V (b) and (c);
provided that the Contractor shall not be required to sell to the Government under this paragraph (a) more than 105 short tons of slab zinc from the concentrates produced during any calendar month.
(b) Any quantity of such concentrates produced in any calendar month, which is not disposed of under paragraph (a) above, or the slab zinc derived therefrom, shall be offered by the Contractor for sale to industry in accordance with its usual method of sale and at its current selling price; provided, however, that such sale shall be for utilization only in the United States and its territories and possessions. Nothing in this paragraph shall obligate the Contractor to sell such slab zinc at less than the prices stipulated in Article Y (a) and (c) hereof, or such concentrates at the price stipulated in Article Y(d) (i).
(c) Any quantity of slab zinc derived from such concentrates processed during any calendar month and not disposed of in accordance with the provisions of paragraphs (a) or (b) above, may be tendered to the Government and the Government shall purchase the quantity so tendered, at prices indicated in Article Y (a) and (c) below. Each such tender shall be made, by written notice, within ten (10) days following the end of the month in which the slab zinc is produced. The Government’s obligation under this paragraph shall be limited to the purchase of 210 short tons of slab zinc derived from any one month’s output of such concentrates, less the quantities of such month’s output of such concentrates disposed of pursuant to paragraphs (a) and (b) above.
(d) If the Contractor is unable after using every reasonable effort for that purpose to deliver zinc in slab form, the Government shall accept delivery in the form of zinc concentrates containing sixty percent (60% ) zinc on the following bases:
(i) the Government shall pay the Contractor for such zinc concentrates sold to it in substitution for *504 the slab zinc pursuant to paragraphs (a) (i) and (c) the price stipulated in Article Y(d) (i);
(ii) the Government shall pay to the contractor for such zinc concentrates sold to it in substitution for the slab zinc pursuant to paragraph- (a) (ii) the price stipulated in Article Y(d) (ii);
provided^, however, that the Government’s obligation under this paragraph shall be limited to the purchase of 850 short tons of zinc concentrates in any one month, or provided further, that if both slab zinc and zinc concentrates are delivered in any one month the total zinc content of the material delivered does not exceed the equivalent of 210 short tons of slab zinc; and the Contractor shall not be required to sell to the Government more than 175 short tons of zinc concentrates in any one month.
ARTICLE V. PRICE
The Government shall pay to the Contractor for slab zinc or zinc concentrates delivered to and accepted by the Government under the terms of this contract the following:
(a) for Prime Western slab zinc under Article III (a) (i) and (c) hereof l7y2 cents per pound with freight allowances to the Government to East St. Louis, Illinois;
ARTICLE IX. TERMINATION
The obligation of the parties hereunder shall cease and this Contract shall be terminated' (except that the obligations of the parties hereto, with respect to the disposition of, and payment for, such quantity of material as may have been produced hereunder prior to the time of such termination, shall remain in full force and effect until discharged in accordance with the terms hereof) either:
(a) upon the expiration of three (3) years from the effective date hereof; or
(b) when the Contractor has produced, hereunder, 5,000 short tons of slab zinc or, if every reasonable effort has first been made to deliver zinc in slab form, equivalent recoverable zinc in the form of concentrates; whichever of the above events (a) or (b) first occurs.
ARTICLE XIX. FORCE MAJETJRE
If the performance of any part of this Contract by either the Contractor or the Government is prevented, hindered or delayed by reason of any cause or causes *505 beyond the respective control of the Contractor or the Government, and which cannot be overcome by due diligence, then the Contractor or the Government, as the case may be, shall be excused from such performance during the continuance of any such happenings or events. To become operative, the Contractor or Government, as the case may be, shall give to the other, within ten (10) days after the occurrence of such happenings or events, written notice thereof, together with a statement setting forth the facts in evidence, and, upon the conclusion of such happenings or events, shall notify the other in writing of such termination within ten (10) days.
ARTICLE XXTTT. CANCELLATION
Notwithstanding any other provision hereof, this contract shall automatically terminate without penalty as to any portion of the Contract remaining uncompleted after August 31,1955.
It will be noted that the contract did not contain the usual clause governing disputes and appeal.
6. Plaintiff had conducted exploratory drilling prior to entering into its contract with defendant for the development of the mine. The results of that drilling were contained in a proposal submitted by plaintiff to the Assistant Administrator of the Defense Minerals Administration under date of February 26, 1951, prior to the execution of the letter of intent. The drill logs indicated that the ore body would average 6.30 percent zinc and 0.22 percent lead. Plaintiff estimated that an investment of approximately $140,000 would be required to develop the ore body and that it would take about 10 months to get into production. Plaintiff believed that on the basis of the then market prices and the expected grade of ore, the investment of $140,000 together with a reasonable operating profit would be returned within 2 years after the commencement of production.
7. Following the execution of the letter of intent of June 30, 1951, plaintiff carried on further explorations and also determined upon the site for the mine shaft. After the selection of the site and the completion of necessary preliminary work, the actual sinking of the shaft commenced on January 2, 1952. Between the week ending January 19 and the week ending February 9, the plaintiff reached a *506 point, beginning at a depth of about 41 feet, where the walls of the shaft would' not stand unaided. At that point plaintiff was obliged to crib and concrete the walls. This was done to safeguard this particular section of the shaft. This work delayed the shaft sinking to the extent that only about 11 feet of progress was made in 3 weeks.
At a point about 100 feet from the surface, plaintiff again encountered fractured' ground on the north side of the shaft. It was not considered necessary to concrete the walls at this point but as a substitute timbers were put in to safeguard against the possibility of loose earth falling and endangering the men who were working in the shaft. The trimming and installation of the timbers had the effect of delaying the sinking of the shaft about a week.
8. Thereafter the progress of the shaft sinking continued with good results until plaintiff reached a depth of approximately 195 feet. There plaintiff encountered broken slabs or boulders on the north section of the shaft and along the wall at the east end of the shaft. The south wall of the shaft had been found to be reasonably good throughout. It was necessary to remove the boulders by hand because, mi-less extreme precaution were used, the unwatering turbine pump in an adjacent drill hole might have been endangered. The larger boulders were snaked with chains and slings. They were hoisted to the surface and then hauled away to waste. The boulders which were too large to be removed in this manner were broken with small dynamite pops. This whole operation was much slower than the normal one in which the ground would be drilled with jackhammers, blasted and then shoveled' into cans or buckets to be hoisted to the surface and dumped into a hopper and trucked away. The encountering of boulders and slabs resulted in a delay of about 11/2 months in the completion of the shaft. Nothing in the drill log for adjacent hole No. 41 would indicate that the formation encountered by the plaintiff should have been anticipated in the sinking of the shaft.
9. When plaintiff reached a depth of about 208 feet, which was about 10 feet from the bottom of the shaft, it experienced difficulty in draining water from the shaft area. This resulted from the smothering or choking of the pump *507 screen, caused by fine material washing through the fractures in the mine shaft into the pump hole — about 15 feet from the mine shaft. Plaintiff endeavored to raise the pump but found that it had become anchored by falling rock or other waste material in the pump hole. In order to overcome this situation a small dog drift or tunnel was driven from the base of the shaft over to the pump. This operation was successful, the pump was freed and put back into satisfactory operation. The plaintiff erected a wooden crib to protect the pump against a recurrence of this condition. About 3 weeks was consumed in driving the small tunnel or dog drift, freeing the pump, and completing the auxiliary work required. While this operation was in progress nothing to speak of could be done in the shaft or development of the mine.
10. After the rescue of the pump, plaintiff commenced development work by removing the loose boulders in the ground in the area north of the shaft and toward the ore vein. This was done by dislodging large slabs and boulders with picks and bars and moving same with slings to the shaft area. From the shaft area these were hoisted to the surface and disposed of as waste. This operation resulted in the excavation of a chamber approximately 30 feet high by 20 feet or more in width with sloping sides and 30 to 35 feet in length. It was so designed to avoid slides and the attendant danger. Considerable shoring was also required in connection with the boulder strata, particularly near the roof, to prevent the occurrence of slides. Plaintiff had contemplated an opening or room about 12 by 16 feet some 20 feet or more from the base of the shaft to facilitate handling long pieces of equipment such as piping, rails and the like. That area had been intended to serve as a mine station and would have represented the normal and accepted practice for such a facility.
11. After the area just described had been opened, plaintiff then drove a smaller tunnel a distance of 10 or 12 feet to the point where the ore indicated by drilling was to be mined. The grade and character of the ore encountered were disappointing. Consequently plaintiff decided to drive a crosscut drift to the north in order to sample the ore body *508 and in this way determine the type of equipment best adapted for use in the mine. Plaintiff had planned, if possible, to use large mechanized equipment but had to know what type of ore body it would experience in order to determine the type of equipment which should be used. The grade of ore encountered in this operation was considerably lower than indicated by the drill logs.
12. Plaintiff had originally contemplated the possibility of using dump trucks and dipper shovels in the operation of the mine. However, after driving this exploratory drift cross cutting the ore body, it was decided that the use of such larger equipment was not feasible and that the mine would have to be operated by the cans and cars method, with small air-activated overhead dipper shovels operating on steel tracks. The wisdom of this decision was confirmed by the actual mining operations. The mine was not placed in operation until approximately October 1, except for the small amount of ore encountered incidental to the crosscut.
13. Had normal conditions been encountered after reaching the foot of the shaft, and had the preliminary work contemplated the use of cans and cars, the mine would have been in operation approximately 6 weeks thereafter. The delay occurring between the middle of April and the first of October was caused by the nature of the ground and the necessity of driving the crosscut which resulted in a change of decision as to the type of equipment to be used in the operation of the mine.
14. The delay occasioned in the development of the mine by the conditions encountered in the sinking of the shaft and the work preparatory to getting into operation on October 1, 1952, amounted to at least 5 months. It was beyond the control of the parties.
15. The geological information which plaintiff had available at the time the operation was commenced indicated that 250 tons of crude ore would be produced per day. Actual production averaged around 190 tons. The character of the ore varied. There were some small local enrich-ments but the average grade experienced was much lower than had been anticipated. The geological data obtained prior to the contract indicated that a production of 6.3 per *509 cent of metallic zinc could be expected, whereas actual production resulted in an average of about 3.3 percent. As a consequence plaintiff would have been obliged to produce almost twice as large a tonnage of crude ore in order to obtain the same quantity of metallic zinc. Conversely, the tonnage of ore originally contemplated would have produced only about half the amount of slab zinc originally estimated. The ore body was also quite irregular in continuity. As the development of the mine progressed plaintiff continuously anticipated that the quality and character of the ore would change. That expectation was predicated on the drill logs. However, the grade never changed appreciably. The veins of ore were found where indicated by the prospect drilling, but were far short of the grade and tonnage expected.
16. A small amount of ore was extracted during the period from July to October 1, 1952. The ore showed an average assay during the months of July, August, and September 1952 of 3, 3.72, and 2.60 percent, respectively. During October and November the ore extracted showed an assay of 2.64 and 3.47 percent, respectively. This information was recorded in defendant’s records by an inspection report dated December 17,1952. An expediter’s report of the same date indicated advice from the plaintiff that the ore was of very low grade. Another report of February 3, 1953, likewise reported the ore to be of low grade. Similar reports for March, April, and June 1953 indicated some improvement with an average assay of 4.29 percent for April. However, the average assay for 1953 was 3.41 percent.
17. Plaintiff furnished defendant monthly statements of the quantity of zinc produced, commencing October 1, 1952. These statements, which were plaintiff’s requests for shipping instructions, show that production through November 1954 amounted to a total of 3,067.8 short tons of zinc. The total production through 1952 amounted to 257.6 short tons (515,367 pounds), and during 1953 amounted to 1,480.5 short tons (2,961,036 pounds).
18. The crude ore production by plaintiff in the operation of the mine is as follows:

*510
Net tons Average assay

1952 _ 10,707 3.15%
1953 _ 57,161 3.41%
1954 (through Nov.) 52,849 3.29%
December 1954_ 4,246 3. 74%
January 1955-3,198 4.26%
February 1955_ 2,625 3. 75%
The total crude ore produced in the operation was 130,786 tons, and the total average assay was 3.38 percent. Had the contemplated assay been realized, plaintiff would have recovered the contract quantity of 5,000 short tons of zinc from 110,000 tons of crude ore. The relative amount of ore found in the mine was below the expectation of the parties to the contract, and was a condition beyond the control of the parties. The difference in grade delayed the performance of the contract so that the production of ore was little more than half the amount which the parties anticipated. It was a condition which commenced before the execution of the definitive contract and continued without interruption during the entire performance of the contract.
19. During 1951 the market price of zinc had risen above the contract price, so that had production been available during that period, the Government stood to profit by its purchases under the contract. This condition did not continue and the plaintiff sold its entire production under the contract at the contract rate which was above the market during the period of actual production. At the time the contract was entered into, zinc was in short supply. It was a prime commodity needed for the national defense and this contract was made to accelerate its production. This condition later ceased.
20. As the mining operation progressed both to the east and west from the base of the shaft, plaintiff left some ore in the walls and pillars to comply with the usual standards of safety. When the mine was finally closed down, plaintiff retreated in an orderly manner, “robbing the pillars” and removing other ore to the extent consistent with sound mining practices and mine safety regulations. These operations required approximately months.
21. The production of metallic zinc from the mine until November 30, 1954, amounted to 3,067.8 short tons. Pro *511 duction. covered the period commencing approximately October 1, 1952, through November 30, 1954, or 26 months. To have produced the total quantity of zinc required by the contract, 5,000 short tons, at the same rate plaintiff would have required an additional 16 months. The low grade of zinc encountered resulted in a delay in the performance of the contract of about 16 months. This delay was caused by a condition beyond the control of either party to the contract.
22. On September 19, 1952, plaintiff advised defendant that because of delays encountered at the foot of the shaft, the starting date of the operation had been delayed and the cost of the project considerably increased. On October 2, 1952 in correspondence discussing the terms to be incorporated in the definitive contract, plaintiff advised defendant that it claimed an extension of 3 months’ time because of the badly broken ground encountered in the construction of the shaft.
23. By letter dated October 22, 1952, defendant advised plaintiff: “* * * we have no objection to making an administrative interpretation that the requested Force Majeure be granted, even though as a purely legal matter, it is questionable as to whether such granting of Force Majeure is obligatory.” Plaintiff was accordingly granted a three-month extension.
24. On April 22,1954, plaintiff applied for an extension of one year within which to produce the tonnage specified in the contract. The request was based upon the circumstances beyond plaintiff’s control, consisting of the fact that the grade of ore was lower than had been anticipated and the difficulties in sinking the shaft and opening up the ore body.
25. On May 6, 1954, defendant acknowledged plaintiff’s request for further extension of time. On October 6, 1954, defendant wrote plaintiff, calling attention to the 10-day written notice provision contained in the definitive contract. Plaintiff was advised by defendant that notwithstanding that provision, an extension of time for the period from September 30 to October 30,1954, would be granted provided plaintiff promptly submitted a detailed report on the alleged force majeure claim and its reason for failing to comply with the 10-day notice requirement. Plaintiff was directed *512 to file a report in time to permit a review and determination prior to October 30, 1954. Defendant advised that the extension in no way imposed an obligation on it to grant additional time if its findings did not warrant such an extension. In the meantime plaintiff was authorized to continue deliveries of slab zinc. On October 11, 1954, plaintiff submitted its detailed request for time extension. Plaintiff advised that it had originally estimated that it would take a period of 8 months to reach the point of production in the mine. Approximately 15 months were actually consumed, leaving a differential of 7 months. Plaintiff further advised that the drill logs, upon the basis of usual calculations, indicated a grade of zinc of approximately 6.3 percent. The actual production developed a grade of only 3.37 percent. Plaintiff advised that it had been originally anticipated that 110,-000 tons of crude ore would produce the amount of slab zinc called for by the contract. At the time of plaintiff’s letter, plaintiff had extracted, through September 30, 1954, approximately 110,601 tons of crude ore and had produced therefrom only 2,852 tons of slab zinc. Plaintiff further advised that the necessity for varying the method of operation in the mine, i.e., heavy mechanized equipment as against the “cans and cars method”, had hampered the operation of the mine, and that the average production for the entire period was approximately 182 tons per day as against 250 tons estimated. Plaintiff while urging that it was entitled to an additional 3 months which would have enabled it to close the mine in an orderly fashion, asked for an extension of only 2 months, advising that it would require approximately 1 month to “rob the pillars” and remove the best of the remaining ore.
26. By letter of October 19,1954, the Commissioner of General Services Administration advised plaintiff that the conditions upon which it made claim for an extension of time were normal business risks and not of a nature or cause contemplated by Article XIX of the contract. Plaintiff’s request for an additional 2 months’ time extension was denied.
27. Plaintiff appealed. The appeal was heard by a Board of Review. The Board determined that all of the causes *513 of delay were beyond the control of the plaintiff. It concluded that with respect to the claims based upon the difference in mining methods and grade of ore, although these causes had occurred in part prior to the signing of the definitive contract, most of the delay occurred later. The Board concluded that failure of the plaintiff to give a 10-day notice pursuant to Article XIX of the contract prevented consideration of these claims. The Board also held that plaintiff was not obliged to give a 10-day notice with respect to the delays in the construction of the physical facilities of the mine, but that the request for further time was not seasonably made and its denial was accordingly recommended. On the basis of the Board’s recommendation, the Administrator of the General Services Administration denied plaintiff’s request for an extension of time by reason of the existence of these conditions causing delay in the performance of the contract, but did extend the contract time to November 30,1954, in order to give full consideration to plaintiff’s claim.
28. Plaintiff thereafter filed a claim with the Comptroller General of the United States for acceptance of its production during December 1954. That claim was denied.
29. Plaintiff commenced the closing of the mine about December 1, 1954, and completed that operation during February 1955. The zinc produced during December 1954 amounted to 243,601 pounds (121.8 tons). Zinc produced in January and February 1955 amounted to 470,095 pounds (235 tons). Had this production been accepted and paid for by the defendant pursuant to the schedule of contract prices, plaintiff would have received a total of $35,153.23 more than the market price for the December 1954, January and February 1955 production. It is for this differential in price that the plaintiff makes claim.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States thirty-five thousand one hundred fifty-three dollars and twenty-three cents ($35,153.23).